**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

**DAVID BRODY,**
Plaintiff,

**COMPLAINT**
**(Jury Trial Demanded)**

v.

Civil Action No. 25-847

**COSTCO WHOLESALE CORPORATION,**
Defendant.

Plaintiff David Brody ("Mr. Brody" or "Plaintiff"), by and through his attorneys, brings this action against Defendant Costco Wholesale Corporation ("Costco" or "Defendant") for violations of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA"), and the Wisconsin Fair Employment Act, Wis. Stat. § 111.31 et seq. ("WFEA"), and alleges as follows:

## I. INTRODUCTION

1. This is an action for disability discrimination, failure to provide reasonable accommodations, and failure to promote based on disability.

2. Mr. Brody is deaf—a condition that substantially limits the major life activity of hearing. He is a qualified individual with a disability under both federal and Wisconsin law.

3. Despite being a dedicated employee with over twelve years of service and extensive supervisory experience, Mr. Brody has been systematically denied advancement to managerial positions because Costco has refused to provide him with an effective reasonable accommodation: a qualified American Sign Language (ASL) interpreter.

4. Costco created a promotional barrier that Mr. Brody could not overcome without accommodation. Costco requires supervisors to achieve "Proof of Readiness" before applying for managerial positions, and Costco management explicitly told Mr. Brody that successful experience as a Front End Supervisor is necessary to achieve this readiness.

5. The Front End Supervisor role requires constant, dynamic communication in a fast-paced retail environment, including urgent two-way radio communication and the ability to access real-time operational information shared among supervisors—what Costco management calls "intel" or "chatter."

6. From 2017 through 2024, Costco repeatedly denied Mr. Brody's requests for ASL interpreters and instead insisted on demonstrably inadequate alternatives: writing tablets, unreliable Video Remote Interpreting (VRI), and a specialized text-based radio system that was technologically flawed and never functioned properly.

7. These inadequate accommodations prevented Mr. Brody from accessing the "intel" and handling the "unique situations" that Costco deemed essential for promotional readiness. Costco then relied on Mr. Brody's 2023 performance review—conducted while he was forced to use these inadequate accommodations—to deem him ineligible for "Proof of Readiness" on November 8, 2023.

8. Costco's conduct violates federal and state laws guaranteeing equal employment opportunities for individuals with disabilities.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Mr. Brody's claims under the ADA pursuant to 28 U.S.C. § 1331.

10. This Court has supplemental jurisdiction over Mr. Brody's state law claims under the WFEA pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as his federal claims.

11. Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District at Costco's warehouse located at 3450 East Towne Boulevard, Madison, Wisconsin 53704, in the Sun Prairie area.

12. All conditions precedent to this action have been satisfied. Mr. Brody timely filed Charge No. 443-2023-02091 with the Equal Employment Opportunity Commission and/or Wisconsin Equal Rights Division. Mr. Brody received a Notice of Right to Sue dated July 18, 2025 and filed this action within ninety days of receipt.

## III. PARTIES

13. Plaintiff David Brody is an adult individual residing in the State of Wisconsin.

14. At all relevant times, Mr. Brody has been employed by Defendant at its warehouse located in Sun Prairie, Wisconsin (Madison area).

15. Mr. Brody is deaf. His deafness substantially limits the major life activity of hearing. He is a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102, and the WFEA, Wis. Stat. § 111.32(8).

16. Defendant Costco Wholesale Corporation is a Washington corporation with its principal place of business at 999 Lake Drive, Issaquah, Washington 98027.

17. Costco does business in the State of Wisconsin and operates multiple warehouse locations throughout Wisconsin, including the Sun Prairie/Madison location where Mr. Brody works.

18. At all relevant times, Costco has been an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 12111(5), employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

19. At all relevant times, Costco has been an employer within the meaning of the WFEA, Wis. Stat. § 111.32(6).

## IV. FACTUAL ALLEGATIONS

### A. Mr. Brody's Employment, Qualifications, and Promotional Barriers

20. Costco hired Mr. Brody on November 10, 2012. He has worked continuously for Costco for over twelve years.

21. Throughout his employment, Mr. Brody has held multiple supervisory positions, including Fresh Food Supervisor, Night Supervisor, Bakery Supervisor, and Produce Supervisor.

22. Mr. Brody has consistently received positive performance evaluations in these supervisory roles, demonstrating his ability to manage staff, oversee operations, and fulfill supervisory responsibilities.

23. Mr. Brody completed Costco's Supervisor Training program in May 2015, qualifying him for advancement to supervisory positions within the company.

24. Mr. Brody seeks advancement to a managerial position—specifically, positions such as Area Manager, Staff Manager, Assistant General Manager or General Manager.

25. Costco requires supervisors to present "Proof of Readiness" before they are eligible to apply for managerial positions. Without this designation, supervisors cannot advance to management regardless of their qualifications or years of service.

26. Mr. Brody has consistently been deemed ineligible for "Proof of Readiness" since he began seeking advancement.

27. Costco management, including former General Manager Justin Ferguson and former General Manager Kim O'Brien, mandated that Mr. Brody must acquire successful experience as a Front End Supervisor to qualify for "Proof of Readiness."

28. On December 13, 2021, GM Ferguson sent Mr. Brody an email explaining the importance of Front End Supervisor experience: "This area also helps new supervisors deal with unique situations with both members and employees. It helps sharpen their skills and prepares them for the next step in their career."

29. Successfully navigating these "unique situations" and developing these "skills" requires full access to real-time communication among supervisors and situational awareness of ongoing store operations—what Costco management refers to as "intel" or "chatter."

30. Costco management has acknowledged that "2-way communication via the radio" requiring an "urgent response (Gas Station emergency, member in crisis, spills etc)" is an essential function of the Front End Supervisor role.

31. Without an effective accommodation enabling Mr. Brody to access radio communications and participate in real-time supervisor communications, Mr. Brody cannot gain the experience Costco deems necessary for promotional readiness.

**B. The 2017 Denial: Costco Explicitly Cites Disability-Related Communication Needs**

32. In June 2017, Mr. Brody applied for a Front End Supervisor position.

33. On June 29, 2017, GM Ferguson denied Mr. Brody the position in a written letter.

34. In the denial letter, Ferguson explicitly cited communication requirements related to Mr. Brody's disability as the basis for the denial, writing: "there are many instances throughout the day that 2-way communication via the radio… takes place. Additionally, many of these require an urgent response…"

35. Ferguson's letter made clear that Mr. Brody's inability to use the radio system without accommodation was the reason for the denial.

36. Despite identifying radio communication as the barrier to Mr. Brody's selection, Costco did not offer any effective accommodations, including an ASL interpreter, to enable Mr. Brody to perform these radio communication functions.

37. Costco's 2017 denial established a pattern that would continue for seven more years: Costco would identify Mr. Brody's need to access radio communications as a barrier to his advancement, but would refuse to provide an effective accommodation that would remove that barrier.

## C. The 2021 Offers and Reversals: Accommodation Requests Lead to Withdrawn Opportunities

38. From February 2021 to April 2021, Mr. Brody successfully managed the bakery business without a bakery manager for two months, demonstrating his supervisory capabilities and leadership skills.

39. At the end of April 2021, Mr. Brody met with GM Ferguson to discuss his career development goals. Ferguson advised Mr. Brody to wait until September 2021, when supervisor rotation opportunities would be available for him to pursue.

40. In July 2021, Ferguson provided Mr. Brody with a revised performance review that showed Mr. Brody had far better supervisory performance than the original and questionable performance review that was never completed in November 2020. The revised performance review demonstrated that Mr. Brody successfully supervised the bakery department.

41. In August 2021, GM Ferguson initiated a discussion asking whether Mr. Brody was interested in a rotation into the Front End Supervisor role.

42. On August 30, 2021, Mr. Brody inquired about disability accommodation, writing: "I would need an interpreter as accommodation for eight hours a day to run the front end…"

43. In September 2021, Ferguson and Matt Day met with Mr. Brody, during which Ferguson informed Mr. Brody that he refused to rotate him to the Front End Supervisor position, providing no legitimate explanation for this refusal.

44. The temporal proximity between Mr. Brody's accommodation inquiry and Ferguson's refusal to provide the rotation opportunity supports an inference that the opportunity was withdrawn because Mr. Brody requested a disability accommodation.

45. Around this time in fall 2021, Costco posted a seasonal Front End Supervisor position.

46. Mr. Brody applied for the position and was the only candidate who applied who was not granted an interview.

47. On October 18, 2021, when Mr. Brody inquired about why he had not been interviewed, Ferguson falsely claimed Mr. Brody was uninterested: "I'm confused why you would want

an interview since we offered you a permanent position on the Front End and you declined."

48. Ferguson's statement was demonstrably false. Mr. Brody had never declined the permanent Front End Supervisor rotation; he had merely inquired about interpreter accommodation and indicated he would remain bakery supervisor for the time being while considering the opportunity. Ferguson then unilaterally refused to proceed with the rotation.

49. Ferguson's mischaracterization of Mr. Brody's accommodation inquiry as a "decline" reflects discriminatory animus based on Mr. Brody's need for disability accommodation.

50. After denying Mr. Brody an interview for the position, Ferguson mandated that Mr. Brody repeat the Supervisor in Training (SIT) program, despite Mr. Brody having completed it in 2015 and having seven years of successful supervisory experience, including his successful two-month management of the bakery department without a manager.

51. Ferguson did not require other supervisors with comparable experience to repeat the SIT program before rotating into Front End Supervisor positions.

52. Requiring only Mr. Brody to repeat the SIT program was pretextual and discriminatory, imposed as retaliation after he requested disability accommodation.

### D. The January 2022 Discriminatory Hiring Decision

51. In January 2022, while Mr. Brody was being forced to repeat the SIT program, Costco posted a full-time Front End Supervisor position.

52. Mr. Brody applied for the position.

53. Ferguson hired a different candidate—an individual with significantly less experience than Mr. Brody.

54. The selected candidate had not previously served in any supervisory capacity at Costco and had substantially fewer years of service than Mr. Brody.

55. The selected candidate did not have a disability requiring accommodation.

56. Selecting a significantly less experienced candidate over Mr. Brody supports an inference that Mr. Brody's disability and need for accommodation were motivating factors in the decision.

**E. The 2022 SIT Program: Failure to Engage in Good-Faith Interactive Process**

57. Under pressure from Ferguson's mandate, Mr. Brody reluctantly agreed to repeat the SIT program in 2022.

58. On April 8, 2022, Mr. Brody formally requested a full-time sign language interpreter for the SIT program.

59. He explained that a full-time interpreter was necessary to access the full learning experience, including informal communications, discussions, and real-time operational information ("intel") shared throughout the workday.

60. On April 25, 2022, Costco held a Job Assessment Meeting (JAM) with GM Ferguson and Julie Fraizer from Costco's Integrated Leave and Accommodation Department.

61. Mr. Brody explained the necessity of an interpreter for the fast-paced Front End environment and emphasized his need to access "incidental information" and understand what other supervisors were discussing to learn the role effectively.

62. Rather than granting an interpreter, Ms. Fraizer suggested a "Connect a Desk" device and a "Boogie Board" writing tablet.

63. Mr. Brody explained why these alternatives would be ineffective and why VRI would be inadequate for the role.

64. He detailed specific problems with VRI: Wi-Fi connectivity issues, delays of up to ten minutes in securing an interpreter, background noise interference, and variable interpreter quality.

65. He also explained why voice-to-text applications (such as AVA) are inaccurate in fast-paced, multi-speaker environments.

66. Despite these explanations, Costco refused to provide a full-time interpreter.

67. On May 3, 2022, Ferguson formally offered only a part-time interpreter for classroom-style training segments of the SIT program.

68. The offer required Mr. Brody to use writing tablets and VRI for all on-the-job communication and real-time operational situations identified as critical to promotional readiness.

69. Costco scheduled the SIT program to begin on May 2, 2022, but failed to secure adequate interpretation services for that start date.

70. Costco scheduled an interpreter whom Mr. Brody identified as unqualified; when he objected, Costco postponed training rather than securing a qualified interpreter.

71. Mr. Brody identified Versatile Interpreting Service, which had availability for the rescheduled June 2022 dates, and provided Costco with contact information and confirmation of availability.

72. Costco management failed to act on this information.

73. GM Ferguson transferred out of the Sun Prairie location before securing interpreters.

74. Kim O'Brien became the new General Manager.

75. On June 16, 2022—less than one week before the rescheduled June 22 start—GM O'Brien agreed to book interpreters from Versatile Interpreting Service after Mr. Brody escalated concerns to HR.

76. Because Costco waited until the last minute, Versatile could cover only 84% of scheduled training days.

77. These delays and failures constitute bad-faith participation in the interactive process and resulted in incomplete interpreter coverage.

## F. Success with Effective Accommodation and Documented Failure of Alternatives

78. During the June–August 2022 SIT program, when a qualified interpreter was present, Mr. Brody excelled in the Front End Supervisor role.

79. With interpreter assistance, he managed unique situations, supervised employees, interacted with members, and utilized the walkie-talkie system through his interpreter to receive and respond to urgent communications.

80. This success demonstrates he can perform the essential functions with reasonable accommodation.

81. On days when an interpreter was unavailable due to Costco's failures, Mr. Brody attempted the alternative accommodations.

82. As predicted, these alternatives proved ineffective in practice.

83. On November 1, 2022, Mr. Brody submitted a detailed report documenting the failures.

84. He reported voice recognition apps failed due to background noise, inability to capture group conversations, and inaccuracies.

85. He reported members became "irritated waiting" for written communication via the Boogie Board and often walked away.

86. He reported the writing tablet was too slow and prevented managing multiple situations simultaneously.

87. He reported feeling "clueless" without access to supervisor radio communications and "intel."

88. On September 9, 2022, his SIT evaluation indicated he performed "far more than expectation," demonstrating ability with effective accommodation.

## G. Job Offer Conditioned on Inadequate Accommodations (Oct. 2022–Feb. 2023)

89. On October 7, 2022, GM O'Brien offered Mr. Brody a permanent Front End Supervisor position based on his excellent SIT performance.

90. O'Brien stated approval of a full-time interpreter was "limited to the SIT program" and insisted on "exploring alternatives" for the permanent role.

91. When Mr. Brody inquired about the hesitation, O'Brien wrote "$16,000" on paper, referencing interpreter costs during the SIT program.

92. Citing cost reveals the decision was based on financial considerations, not legitimate undue-hardship analysis.

93. On October 12, 2022, Mr. Brody formally requested an ASL interpreter for the permanent role, reiterating prior failures and suggesting cost-effective solutions, including an in-house interpreter.

94. Costco delayed any response for two months.

95. On December 12, 2022, Costco held another JAM and introduced Dori Weinberger from Briotix Health.

96. Ms. Weinberger had no experience with accommodations for deaf individuals and no expertise in sign language interpretation.

97. Costco nevertheless relied on her recommendations.

98. She recommended continued use of the Boogie Board and VRI—accommodations that had demonstrably failed—and a new specialized text-based radio system (Motorola Ion Portable Smart Radio).

99. Management stated that radio communication via text would be limited to matters "directly related to his position," excluding broader supervisor communications and "intel."

100. This limitation would prevent Mr. Brody from developing the situational awareness and handling "unique situations" needed for promotional readiness.

101. On December 12, 2022, Costco formally denied the interpreter request.

102. On February 1, 2023, GM O'Brien dismissed Mr. Brody's documented concerns as "hypothetical perceptions," despite his detailed November 1, 2022 report and real-world experience.

103. This dismissal reflects bad-faith participation in the interactive process.

104. After a five-month delay between the offer and accommodation resolution, Mr. Brody reluctantly agreed to start the permanent role on March 22, 2023, using the alternatives, based on O'Brien's commitment to reassess if ineffective.

**H. Immediate Failure of Alternatives and Constructive Removal (Mar.–Apr. 2023)**

105.     On March 22, 2023, Mr. Brody's first day in the permanent role, O'Brien informed him the Motorola Ion system was backordered and not yet available.

106.     The specialized radio system did not arrive until February 5, 2024.

107.     From March 22, 2023 through February 5, 2024, Mr. Brody had no radio access and was forced to rely on the writing tablet and non-functional VRI.

108.     He documented serious communication failures in letters dated March 24, March 27, and April 3, 2023.

109.     On March 24, 2023, he missed an urgent radio call for a supervisor key flick at Membership because he had no radio access.

110.     Members became confused with Boogie Board communication and often walked away.

111.     Cashiers began bypassing him, seeking assistance from other supervisors due to slow written exchanges.

112.     He felt "clueless" about operations without access to radio "intel."

113.     These failures prevented effective management, urgent responses, and the development of skills Costco requires for readiness.

114.     On April 12, 2023, acknowledging the failures, O'Brien transferred Mr. Brody out of Front End Supervisor to Produce Supervisor pending the radio's arrival.

115.     O'Brien characterized the transfer as temporary.

116.     The transfer confirms Costco knew the accommodations were ineffective.

117.     This denial followed Mr. Brody's removal from the role due to failed accommodations.

118.     From August 2023 through at least February 2024, VRI was entirely non-functional.

119.     On January 10, 2024, Mr. Brody reported to management that VRI had not worked for months; Costco took no action.

## I. 2023 Performance Evaluation and Denial of "Proof of Readiness"

121.     On November 8, 2023, Mr. Brody received his annual evaluation from O'Brien.

122.     The evaluation covered the period when he worked with inadequate accommodations (March 22–April 12, 2023) and after transfer due to those failures.

123.     Based on this evaluation, O'Brien deemed Mr. Brody ineligible for "Proof of Readiness."

124.     This determination was based on performance during a period when effective accommodations were denied.

125.     Mr. Brody's lack of promotional readiness was the direct and foreseeable result of Costco's refusal to provide effective accommodations enabling him to gain experience and demonstrate required skills.

126.     Denial of readiness based on performance during inadequate accommodation constitutes disability-based discrimination and perpetuates the barrier to advancement.

## J. Technological Failure of the Motorola Ion System (Feb. 2024)

127.     The Motorola Ion Portable Smart Radio system arrived on February 5, 2024—nearly one year after the permanent placement and ten months after the transfer.

128.     Mr. Brody used TRBOnet Mobile on a company iPhone during a two-week evaluation (February 5–18, 2024).

129.     The system proved entirely ineffective and technologically flawed.

130.     It was fundamentally designed for one-way communication (text-to-voice) and could not reliably convert incoming analog voice messages into real-time text for Mr. Brody.

131.     The app frequently lost connection ("Connection problem" / "Waiting for connection"), requiring constant restarts.

132.     iPhone vibration alerts for incoming calls were about one second and imperceptible when the phone was pocketed or on a belt.

133.     Costco provided an Apple Watch, but TRBOnet Mobile did not support watch haptics, rendering it useless for notifications.

134.     Costco did not resolve the notification failure despite repeated reports.

135.     Due to notification failures, Mr. Brody missed 100% of incoming radio calls unless actively looking at the iPhone screen.

136.     Messages were severely delayed (e.g., a 9:43 a.m. message arrived at 11:05 a.m., an 82-minute delay), making the system useless for urgent communications.

137.     The system segregated his communications from regular supervisor radio channels and "intel," preventing access to standard traffic.

138.     Other supervisors stopped attempting to use the system and reverted to analog radios, excluding Mr. Brody.

139.    On February 27, 2024, O'Brien acknowledged technical problems but called them "initial kinks," accused Mr. Brody of being "uninterested," and suggested he "adjust your sleeve so you could see the watch," placing the burden on him.

140.    The lack of adequate accommodations prevented him from handling "unique situations" and gaining experience needed for readiness.

141.    After years of failed accommodations and barriers, Mr. Brody stepped down from Front End Supervisor on February 19, 2024.

142.    After stepping down, Brody worked as a stocker for a few months until he transferred and continued to work as a part-time RTV clerk, as of today's filing.

**K. Causal Connection Between Disability, Accommodation Requests, and Adverse Actions**

143.    A pattern of adverse actions correlates with Mr. Brody's disability and accommodation requests:

a. **June 2017:** Denial of Front End Supervisor due to radio communication needs without effective accommodation;

b. **September 2021:** Withdrawal of rotation weeks after interpreter request;

c. **October 2021:** False claim he "declined" to justify denying an interview;

d. **October 2021:** Unique requirement that he repeat SIT;

e. **January 2022:** Selection of a significantly less experienced candidate after accommodation requests;

f. **2022–2023:** Delays, obstruction, and denial of effective accommodations while claiming an interactive process;

g. **April 2023:** Removal from Front End Supervisor after failures of inadequate accommodations;

h. **November 2023:** Denial of "Proof of Readiness" based on performance during periods without effective accommodation.

144.    The temporal proximity between accommodation requests and adverse actions supports a strong inference that disability and the need for accommodation were but-for causes.

145.    Costco's explicit references to cost ($16,000) and disability-related communication requirements constitute direct evidence of discriminatory motivation.

146.    Costco treated Mr. Brody less favorably than similarly situated supervisors without disabilities seeking Front End Supervisor positions and advancement.

147.    Costco's systematic refusal to provide effective accommodations over seven years, despite knowing they were necessary for promotional requirements, demonstrates intentional discrimination.

148.    But for Mr. Brody's disability and need for accommodation, Costco would not have denied Front End Supervisor positions in 2017 and 2022, withdrawn opportunities in 2021, imposed unique barriers such as repeating SIT, denied effective accommodations, removed him from the position in 2023, or denied "Proof of Readiness" in 2023.

## COUNT I

## Violation of the Americans with Disabilities Act – Failure to Provide Reasonable Accommodation 42 U.S.C. § 12112(b)(5)(A)

149.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

150.     Mr. Brody is a qualified individual with a disability within the meaning of the ADA.

151.     He is deaf; his deafness substantially limits the major life activity of hearing.

152.     Costco knew of Mr. Brody's disability at all relevant times.

153.     The essential functions of the Front End Supervisor position include, but are not limited to, maintaining situational awareness of front-end operations, responding to member and employee needs in a timely manner, and coordinating with other supervisors to resolve urgent issues. The physical act of listening to and speaking into an analog radio is a method of performing these functions, not an essential function in and of itself.

154.     As demonstrated during his successful performance in the 2022 SIT program, a qualified ASL interpreter is a reasonable accommodation that enables Mr. Brody to perform all essential functions of the position fully and effectively, including by receiving and relaying communications in real-time.

155.     Mr. Brody requested a reasonable accommodation: qualified ASL interpreters to enable performance of these essential functions.

156.     Interpreters would enable effective communication, access to urgent radio communications, participation in real-time supervisor discussions and "intel," immediate responses to emergencies, and acquisition and demonstration of skills necessary for promotional readiness.

157.     ASL interpreter services are a well-established, effective, commonly used accommodation for deaf employees in supervisory/management roles.

158.     Costco refused to provide interpreters and insisted on alternatives it unilaterally selected.

159.     Those alternatives were demonstrably ineffective:

a. **Boogie Board writing tablets** were too slow, frustrated members, impeded multi-tasking, and provided no access to radio or "intel."

b. **VRI** was unreliable due to Wi-Fi issues, interpreter wait times, noise interference, variable interpreter quality, and was entirely non-functional from August 2023 to February 2024.

c. **Voice-to-text apps** (e.g., AVA) were inaccurate in fast-paced, multi-speaker, noisy environments and failed to capture group conversations and operational discussions.

d. **Motorola Ion / TRBOnet Mobile** was effectively one-way, suffered connectivity problems, imperceptible alerts, no Apple Watch haptics support, severe message delays, segregated communications from standard channels, and blocked access to real-time "intel."

160.     Mr. Brody repeatedly informed Costco of these failures in detailed reports and contemporaneous letters, and Costco's own actions—removing him from the role—confirm ineffectiveness.

161.     Costco failed to engage in a good-faith interactive process by repeatedly proposing failed tools, dismissing documented evidence as "hypothetical," delaying five months on

the offer and a year on the radio, failing to timely secure qualified interpreters (resulting in 84% coverage), scheduling an unqualified interpreter and postponing training, relying on a consultant lacking relevant expertise, failing to remedy known VRI and radio issues, expressly limiting radio access to matters "directly related to his position," and placing the burden on Mr. Brody to "adjust [his] sleeve."

162.    Defendant's failure to provide a reasonable and effective accommodation, in and of itself, altered the terms and conditions of Mr. Brody's employment by denying him an equal opportunity to succeed in the Front End Supervisor role and pursue promotional opportunities available to non-disabled employees

163.    Providing interpreters would not impose undue hardship on Costco, a large corporation with vast resources and revenues exceeding $240 billion annually; cost references (e.g., "$16,000") show cost—not hardship—drove denial.

164.    Costco has not shown significant difficulty or expense under 42 U.S.C. § 12111(10)(A).

165.    As a direct and proximate result of Costco's failures, Mr. Brody suffered and continues to suffer damages, including denial of "Proof of Readiness," lost promotional opportunities and compensation, lost future earning capacity, emotional distress and humiliation, reputational harm, and other economic and non-economic damages.

166.    Costco acted willfully, maliciously, and with reckless disregard of Mr. Brody's federally protected rights.

**COUNT II**

**Violation of the Americans with Disabilities Act – Disability Discrimination and Failure to Promote**

**42 U.S.C. § 12112(a)**

166.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

167.     Mr. Brody is an individual with a disability within the meaning of 42 U.S.C. § 12102.

168.     With reasonable accommodation, he can perform the essential functions of the Front End Supervisor and management positions he seeks.

169.     Mr. Brody suffered multiple adverse employment actions based on disability, including:

a. Denial of Front End Supervisor in June 2017;

b. Withdrawal of the rotation in September 2021 after requesting accommodation;

c. Denial of an interview for the seasonal Front End Supervisor role in October 2021;

d. Requirement to repeat SIT in October 2021;

e. Non-selection in January 2022 in favor of a significantly less experienced candidate;

f. Denial of effective accommodations throughout 2022–2024;

g. Involuntary transfer out of the Front End Supervisor role in April 2023;

h. Denial of "Proof of Readiness" in November 2023; and

i. Continued denial of eligibility for advancement.

170.     These actions include denial of promotional opportunities, application of discriminatory criteria, and imposition of barriers not applied to non-disabled employees.

171.     Defendant's policy requiring 'Proof of Readiness' based on Front End Supervisor experience, when combined with its refusal to provide effective accommodations for deaf employees to gain that experience, operates as a method of administration that has the effect of discriminating based on disability and creates a disparate impact on deaf employees seeking promotion. This policy, as applied to Mr. Brody, is not job-related or consistent with business necessity because Defendant's own actions rendered the policy's requirements unattainable for him.

172.     Costco took these actions because of Mr. Brody's disability and his need for accommodation.

173.     But for Mr. Brody's disability, Costco would not have taken these adverse actions.

174.     Costco engaged in disparate treatment by denying the 2017 position explicitly due to disability-related communication concerns without providing effective accommodations; withdrawing 2021 opportunities after accommodation requests; mischaracterizing the request as a "decline" to deny an interview; forcing a unique SIT repetition; selecting a significantly less experienced non-disabled candidate; conditioning readiness on performance without effective accommodations; and denying readiness based on performance during periods without accommodations.

175.    Costco used criteria and methods of administration that had the effect of disability discrimination. The "Proof of Readiness" requirement discriminates because readiness hinges on Front End Supervisor experience, which requires access to radio "intel"; Costco refused effective accommodations to access that "intel"; without accommodations, Mr. Brody could not gain the required experience; and Costco then relied on that lack of experience—caused by its own failures—to deny promotion.

176.    Applying "Proof of Readiness" in this manner constitutes discrimination through facially neutral policies with disparate impact not shown to be job-related and consistent with business necessity.

177.    Direct evidence of discriminatory motivation includes Ferguson's 2017 letter citing disability-related communication needs and O'Brien's cost notation ("$16,000"), as well as temporal proximity to requests.

178.    Mr. Brody's disability and accommodation needs were motivating factors and but-for causes of the adverse decisions.

179.    As a direct and proximate result of this discrimination, Mr. Brody suffered the damages described above.

180.    Costco acted willfully, maliciously, and with reckless disregard of Mr. Brody's ADA rights, warranting punitive damages.

## COUNT III

**Violation of the Wisconsin Fair Employment Act – Failure to Accommodate**

**Wis. Stat. § 111.34(1)(b)**

180.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

181.     Mr. Brody is an individual with a disability under Wis. Stat. § 111.32(8).

182.     He is deaf, which substantially limits hearing and makes achievement in the Front End Supervisor position unusually difficult without accommodation.

183.     Costco was aware of his disability and his need for accommodations at all relevant times.

184.     Reasonable accommodations exist that would enable performance and advancement, specifically qualified ASL interpreters to ensure effective communication, radio access, participation in real-time discussions, and skill development necessary for advancement.

185.     The WFEA provides broader accommodation protections than the ADA, including potentially modifying job duties or reassigning certain functions.

186.     Costco refused reasonable accommodations and insisted on demonstrably ineffective alternatives detailed above.

187.     Costco has not demonstrated that providing ASL interpreters would pose a hardship on its operations (as opposed to mere inconvenience).

188.     Under Wisconsin law, the employer bears the burden of proving hardship; Costco has not met that burden.

189.    Interpreters would not pose a hardship in light of Costco's financial resources, size, and operations.

190.    As a direct and proximate result of Costco's WFEA violations, Mr. Brody suffered damages including lost wages, lost promotional opportunities, and other economic losses.

**COUNT IV**

**Violation of the Wisconsin Fair Employment Act – Disability Discrimination**

**Wis. Stat. § 111.322**

191.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

192.    Mr. Brody is an individual with a disability within the meaning of Wis. Stat. § 111.32(8).

193.    With reasonable accommodations, he was and is qualified to perform the job-related responsibilities of Front End Supervisor and the management roles he seeks.

194.    He suffered adverse employment actions, including denial of positions, withdrawal of opportunities, imposition of discriminatory barriers, and denial of advancement.

195.    Costco took these actions because of his disability, as evidenced by the facts alleged above, including express reliance on disability-related communication concerns and cost.

196.    The WFEA prohibits disability-based discrimination in promotion, advancement, and terms, conditions, and privileges of employment.

197.    Costco's actions—including unnecessary barriers to advancement, disparate treatment, and failure to promote by denying accommodations necessary to meet promotional criteria—constitute unlawful discrimination under the WFEA.

198.     As a direct and proximate result, Mr. Brody suffered damages including lost wages, lost promotional opportunities, and other economic losses.

---

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Brody respectfully requests that this Court enter judgment in his favor and against Defendant Costco Wholesale Corporation, and grant the following relief:

### A. Declaratory Relief

A declaration that Defendant's practices and policies as alleged herein violate the ADA and the WFEA.

### B. Injunctive Relief

1. A permanent injunction restraining Defendant from:

    a. Discriminating against Mr. Brody or any other employee on the basis of disability;

    b. Failing to provide reasonable accommodations to qualified individuals with disabilities;

    c. Retaliating against Mr. Brody or any other employee for asserting rights under the ADA or WFEA;

    d. Applying the "Proof of Readiness" requirement in a discriminatory manner that creates barriers to advancement for individuals with disabilities; and

e. Continuing any practices, policies, or procedures that violate the ADA or WFEA.

2.  An order requiring Defendant to:

a. Provide Mr. Brody with reasonable and effective accommodations, including qualified ASL interpreters, necessary for him to perform the duties of Front End Supervisor and/or managerial positions and to achieve "Proof of Readiness";

b. Immediately designate Mr. Brody as having achieved "Proof of Readiness" for promotional purposes, given that prior failure to achieve this designation resulted from Defendant's discriminatory failure to accommodate;

c. Place Plaintiff into a managerial position or Front End Supervisor position with appropriate accommodations commensurate with his qualifications, experience, and years of service; or, in the alternative, provide front pay in lieu of such placement;

d. Implement and maintain policies, procedures, and training to ensure compliance with the ADA and WFEA, including training for all management personnel on disability discrimination, reasonable accommodations, and the interactive process;

e. Post notice of employee rights under the ADA and WFEA in locations accessible to all employees; and

f. Report to the Court on compliance for a period determined by the Court.

**C. Monetary Damages Under the ADA**

1. **Back Pay:** With prejudgment interest, including all lost wages, salary, bonuses, benefits, pension contributions, and other compensation Mr. Brody would have received had he been hired/promoted as alleged and not subjected to discrimination, calculated from each discriminatory act through judgment.

2. **Front Pay:** For future lost earnings and benefits if reinstatement is not feasible or would be futile, for a reasonable period determined by the Court.

3. **Compensatory Damages:** Pursuant to 42 U.S.C. §§ 12117 and 1981a for emotional pain and suffering, mental anguish, loss of enjoyment of life, humiliation, reputational injury, future pecuniary losses, medical/counseling expenses related to emotional distress, and other non-pecuniary losses, subject to caps in 42 U.S.C. § 1981a(b)(3).

4. **Punitive Damages:** Under 42 U.S.C. § 1981a(b)(1) based on Defendant's malice and reckless indifference, including explicit cost reliance, repeated refusal of effective accommodations despite knowledge of ineffectiveness, bad-faith interactive process, imposition of unique barriers, and reliance on performance during inadequate accommodation to deny advancement, subject to statutory caps.

**D. Monetary Damages Under the WFEA**

All available WFEA remedies, including back pay (up to two years prior to the ERD filing), front pay where available, other economic losses, and appropriate equitable relief.

**E. Pre- and Post-Judgment Interest**

At applicable legal rates from the date damages were incurred through judgment, and thereafter until paid.

**F. Attorney's Fees and Costs**

Reasonable attorney's fees, litigation expenses, and costs under 42 U.S.C. § 12117(a), 29 U.S.C. § 794a(b), Wis. Stat. § 111.39(4), and any other applicable authority, calculated using the lodestar method, including fees and costs through trial and any appeals.

**G. Such Other and Further Relief**

As the Court deems just, proper, and equitable.

---

**VI. DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable, including all claims for compensatory and punitive damages under the ADA.

---

Dated: October 16, 2025                    Respectfully submitted,

Andrew Rozynski, Esq.

**EISENBERG & BAUM, LLP**

24 Union Square East, PH

New York, NY 10003

Tel: (212) 353-8700

Fax: (917) 592-287

**Attorneys for Plaintiff David Brody**